SOCIAL SECURITY ADMINISTRATION
Office of Hearings and Appeals

DECISION

| IN THE CASE OF | CLAIM FOR |
|---|---|
| | Period of Disability, Disability Insurance Benefits, and |
| John R. Walker | Supplemental Security Income |
| (Claimant) | |
| | ▬2101 |
| (Wage Earner) | (Social Security Number) |

## PROCEDURAL HISTORY

This case is before the Administrative Law Judge on a request for a hearing filed by the claimant, who is dissatisfied with the previous determination finding that he is not disabled. The claimant filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income on September 12, 2002, originally alleging disability since September 9, 1999. After a proper notice, a hearing was held on July 22, 2004 in Richmond, Virginia. The claimant personally appeared and testified, after having been advised (both in writing (Exhibits 6B-7B) and by the undersigned at the hearing) of the right to and benefits of counsel, and having elected to proceed without representation. At his hearing, Mr. Walker amended his alleged onset of disability to September 4, 2002. Also testifying was vocational expert Patricia A. Verser.

## ISSUES

The issues in this case are whether the claimant is under a disability as defined by the Social Security Act and if so, when the disability commenced, and the duration of the disability. An additional issue is whether the insured status requirements of the Act are met for the purpose of entitlement to a period of disability and disability insurance benefits.

## EVALUATION OF THE EVIDENCE

After a thorough evaluation of the entire record, the Administrative Law Judge concludes that Mr. Walker has been disabled since September 4, 2002. The claimant last met the insured status requirements of the Social Security Act through September 30, 2003. He has not engaged in any substantial gainful activity since the disability onset date.

At his hearing before this Administrative Law Judge, Mr. Walker testified that he suffers from chronic obstructive pulmonary disease, sleep apnea, chronic and severe low back pain, an umbilical hernia, neck pain, and depression. He said that he weighs 272 pounds at a height of 5'6", a gain of thirty pounds since last year. The claimant testified that from a physical



standpoint his pain and shortness of breath make it difficult to walk more than short distances, sit or stand for more than fifteen minutes at a time, or lift a weight greater than a gallon of milk. The claimant has an extensive number of prescriptions for pain and chronic obstructive pulmonary disease (Exhibits 14E-15E, 17E, 20E and 23E). He is currently undergoing psychiatric treatment in conjunction with the use of multiple medications (including Wellbutrin and Seroquel) for depression, a bipolar syndrome and to help him sleep. The claimant acknowledged a history of difficulty interacting with others, multiple conflicts with others, and a job history characterized by frequent job changes (Exhibit 19E). He advised that he was fired from some jobs, and some he lost due to his history of alcohol abuse. Mr. Walker described experiencing manic symptoms up to four times in the past two years, with these episodes lasting three to four days each. This testimony was consistent with his written statements for the record, particularly in regard to his psychiatric conditions. He acknowledged increasing problems with aggressiveness, antagonistic behavior, depression, mood swings and difficulty controlling his temper towards others despite the use of prescribed medications (Exhibits 9E-18E).

The medical evidence establishes the existence of impairments reasonably likely to produce some of the symptoms and limitations alleged by the claimant. From a physical standpoint, the submitted medical evidence confirms his diagnoses of an umbilical hernia, hypertension, gastroesophageal reflux disease, chronic obstructive pulmonary disease, degenerative disc disease of the cervical and possibly the lumbosacral spine with neck and back pain, obesity with obstructive sleep apnea, and a hearing loss with tinnitus (Exhibits 1F-2F, 9F-17F, and 19F). A consultative examination by Dr. Aydin Uzunpinar on January 2, 2003 confirmed that the claimant had a reducible umbilical hernia, a mild decrease of his hearing, cervical spondylosis with degenerative joint disease of the cervical spine on x-ray with a cervical nerve impingement syndrome and limitation of neck range of motion, and that he was obese, weighing 222 pounds at a height of "6 feet 6 inches" (sic). (The claimant is in fact 5'6" tall according to Exhibits 14F and 19F). He opined that the claimant had a residual functional capacity for a limited range of light work (Exhibit 3F).

More serious, however, are Mr. Walker's psychiatric conditions. When seen consultatively on June 16, 2003 by licensed clinical psychologist Michael F. Fielding, Ph.D., the claimant acknowledged his history of drug and alcohol abuse until his September 1999 incarceration, his history of multiple arrests, and long-term history of depression. Mr. Walker described his lifestyle as anti-social; Dr. Fielding also observed narcissistic traits. The claimant received a dishonorable discharge from the U.S. Army; he admitted to being absent without leave on numerous occasions. Dr. Fielding diagnosed a major depressive disorder (recurrent), a polysubstance disorder in remission for the last three years, and a mixed personality disorder, along with a provisional diagnosis of a pain disorder. He described the claimant's prognosis as guarded without intervention (Exhibit 4F). Consistent with his testimony, Mr. Walker is undergoing outpatient psychiatric care through the Richmond Behavioral Health Authority, and was initially diagnosed with a bipolar disorder that included manic symptoms of hyperactivity, pressured speech, an unstable mood and impulsivity. Psychiatrist Dr. Estelle H. Cline now treats him for a dysthymic disorder and an intermittent explosive disorder characterized by pathologically inappropriate hostility, with underlying depressive symptoms of sleep and appetite disturbances, emotional lability, social withdrawal and difficulty thinking or concentrating. She opined that he was incapable of working a normal workday or work-week

due to a "poor" or no ability to understand, remember and carry out complex instructions, perform a variety of duties, work in coordination or proximity with others without being distracted, respond appropriately to criticism from supervisors, perform effectively under stress, or interact appropriately with the public or co-workers (Exhibits 8F, 16F and 18F).

The medical evidence described above establishes that Mr. Walker has the following impairments which are considered to be "severe" under Social Security Regulations: a personality disorder/intermittent explosive disorder, a major depressive disorder, chronic obstructive pulmonary disease with obstructive sleep apnea, obesity, hypertension, cervical spondylosis and degenerative joint disease, and a sensorineural hearing loss with tinnitus. While Mr. Walker has a history of drug and alcohol abuse, the record clearly reflects that his polysubstance abuse has been in sustained, full remission since 1999 and has not had even a minimal effect on his ability to function since that time.

Based on a review of the record in this case, the undersigned further determined that the claimant's impairments are attended with the specific clinical signs and diagnostic findings required to meet the requirements set forth in section 12.08A and B of the Listing of Impairments in Appendix 1 to Subpart P, 20 C.F.R. Part 404. Section 12.08 of Appendix 1 addresses personality disorders. The record in this case reflects that from a psychiatric standpoint, his personality disorder/intermittent explosive disorder is accompanied by symptoms meeting the "A" criteria of section 12.08: pathological dependence, passivity and aggressivity reflected in anti-social and narcissistic traits, and pathologically inappropriate hostility, with underlying depressive symptoms of sleep and appetite disturbances, emotional lability, social withdrawal and difficulty thinking or concentrating. To fully meet this section, there must also be evidence of at least two of four functional limitations ("B" criteria) of marked or extreme severity. The record reflects that due to his psychiatric impairments, Mr. Walker has exhibited a mild restriction of his activities of daily living. However, in view of his social isolation, difficulty interacting with others, and clear inability to sustain work (reflected in frequent job changes), he has marked difficulties maintaining social functioning. His symptoms and medications cause marked difficulties maintaining concentration, persistence or pace, but they have not resulted in repeated episodes of decompensation. With signs and symptoms meeting section 12.08 "A" along with two functional limitations ("B" criteria) of "marked" severity, the claimant's psychiatric conditions fully meet section 12.08A and B. This conclusion is supported by the opinion of the treating source, Exhibit 18F; and the medical signs and findings and the claimant's significant medical treatment history, Exhibits 1F-4F, and 8F-18F.

In accordance with Social Security Ruling 96-6p, the Administrative Law Judge has considered the administrative findings of fact made by the State agency medical physicians and other consultants. These opinions are weighed as statements from nonexamining expert sources. New medical evidence from the treating source is given more weight than the State agency opinions. With impairments fully meeting section 12.08 of Appendix 1, the claimant is disabled within the meaning of the Social Security Act and Regulations and is entitled to a period of disability commencing September 4, 2002, and to disability insurance benefits and supplemental security income based on his applications filed on September 12, 2002. His history of substance abuse, now in full, sustained remission, is not a contributing factor material to the finding of disability.

Considering the medical evidence and the claimant's expected medical improvement with appropriate psychiatric treatment, the Administrative Law Judge recommends a continuing disability review be carried out within one year of the date of this decision.

## FINDINGS

After consideration of the entire record, the Administrative Law Judge makes the following findings:

1. The claimant has not engaged in any substantial gainful activity since the amended disability onset date.

2. The claimant's impairments which are considered to be "severe" under the Social Security Act are the following: a personality disorder/intermittent explosive disorder, a major depressive disorder, chronic obstructive pulmonary disease with obstructive sleep apnea, obesity, hypertension, cervical spondylosis and degenerative joint disease, and a sensorineural hearing loss with tinnitus.

3. The claimant's psychiatric impairments meet in severity the appropriate medical findings published in section 12.08A and B of 20 CFR Part 404, Appendix 1 to Subpart P (Listing of Impairments).

4. The claimant met the disability insured status requirements of the Social Security Act through September 30, 2003.

5. The claimant has been under a disability since September 4, 2002. His history of substance abuse, now in full, sustained remission, is not a contributing factor material to the finding of disability.

## DECISION

Based on the Title II application filed on September 12, 2002, the claimant is entitled to a period of disability beginning September 4, 2002 and to disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act.

Based on the Title XVI application filed on September 12, 2002, the claimant has been disabled since September 4, 2002, under section 1614(a) (3) (A) of the Social Security Act, and the claimant's disability has continued through at least the date of this decision.

The Social Security Administration must also determine whether the claimant meets the income and resources and other eligibility requirements for supplemental security income payments, and if the claimant is eligible, the amount and the month(s) for which the claimant will receive payment. The claimant will receive a notice from another office of the Social Security Administration when that office makes those determinations.

Considering the medical evidence and the claimant's expected medical improvement with appropriate psychiatric treatment, the Administrative Law Judge recommends a continuing disability review be carried out within one year of the date of this decision.

*[signature]*

Timothy C. Pace
Administrative Law Judge

Date   AUG 2 7 2004

# KELLER & ATWOOD
## Attorneys at Law

7606 Hamilton Avenue
Cincinnati, Ohio 45231

Larry Keller
(513) 522-2000

Daniel C. Atwood
(513) 522-5800

Fax (513) 522-9101



December 6, 1999

Mr. John G. Walker
4626 Kings Road
Victoria, Virginia 23974

Mrs. Marie Walker
1416 Armfield Road, Apt. H
Richmond, Virginia 23225

Re:  <u>State v. Walker</u>,
     Case No. B9907154

Dear Mr. & Mrs. Walker:

   I regret that we could not have done any better than three years in the penitentiary in John's behalf. His record, as well as the terrible facts, made this a very difficult case.

   I told you before that I would be able to do either "a whole lot of something" or "a whole lot of nothing". At first glance, it appears that I was unable to do anything for John.

   However, John's court appointed attorney had what I believe to be a hair-brained idea of trying this case and trying to obtain a conviction of the misdemeanor offense of negligent assault. I consider this preposterous under these facts and circumstances. And, had this lawyer convinced John to try the case and take his chances, and if John were convicted of felonious assault as charged, Judge Crush would probably have given him more in the range of six to seven years in the penitentiary (rather than three years). So, I think I was at least able to save John from the bad advice of his court appointed attorney.

   My work is not yet completed, however. John has a DUI and resisting arrest charge in the county north of Cincinnati that we have to attend to. If we simply let this go, he will be released to Butler County <u>after</u> he serves his three years in prison, and will face additional time for the charges there. What I intend to do, however, is to demand a speedy trial so that these charges are taken care of. Any time imposed on these misdemeanor in Butler County would then, by

Ex 2

operation of Ohio law, then run concurrently (at the same time) as his three years.

    While I regret that I could not have done more, Mr. & Mrs. Walker, I assure you that we did the best as we absolutely we could under these circumstances. It would have been a disaster to try this case and take our chances.

    In any event, thank you once again for your patronage. Best wishes.

Sincerely,

*[signature]*

Larry Keller
Attorney at Law

LK: tlm
ltr.2



# LARRY KELLER
**Attorney at Law**
7606 Hamilton Avenue
Cincinnati OH 45231
(513) 522-2000
Fax (513) 522-9101

May 14, 2001

Ms. Dianna M. Anelli
Assistant Disciplinary Counsel
THE SUPREME COURT OF OHIO
175 South Third Street - Suite 280
Columbus, Ohio 45215-5196

Re:   Your File No.: A0-3498

Dear Ms. Anelli:

This is the long overdue response to the above referenced letter of inquiry. Even though I have been negligent in responding, I trust that you will see that the grievance filed by John Walker is without merit.

## STATEMENT OF FACTS

This was a criminal case for felonious assault. The charge could well have been attempted murder based upon the evidence that was disclosed.

The indictment indicates that on or about September 9, 1999, John Walker knowingly caused, or attempted to cause, physical harm to JoAnn McWhorter by means of a deadly weapon or dangerous ordinance, in this case, a motor vehicle. Specifically, it is alleged that at about 10:30 p.m. on that date, at the 11000 block of Hamilton Avenue in Colerain Township, Hamilton County, Ohio, John Walker repeatedly rammed his motor vehicle into a motor vehicle being driven by JoAnn McWhorter.

Mr. Walker was of no help in preparing the case, as he had totally blacked out from his experience with alcohol on this particular occasion, and had no memory of the events. However, from the discovery received from the prosecutor, from my discussions with witnesses and from my discussions with the police officer, there seemed to be absolutely no doubt concerning guilt.



Ms. Dianna M. Anelli
Re: John Walker
May 14, 2001
Page 2

After having left a drinking establishment known as "Poor Michael's", Mr. Walker became involved in a motor vehicle accident with a car being operated by Ms. McWhorter. He allegedly first intentionally rammed Ms. McWhorter's vehicle while still at the scene, but this is subject to dispute. Ms. McWhorter pulled into a Super America store to get out of traffic and exchange information with Mr. Walker, but Mr. Walker instead left the scene.

Mr. Walker allegedly turned into the side entrance of the Super America store after Ms. McWhorter turned into the front entrance, and while Ms. McWhorter still sat in her automobile, intentionally rammed her vehicle head-on. He then backed up and proceeded to ram her vehicle again and again. Accounts vary concerning whether he did this two times to as many as five times. All the while, however, he was alleged to have been laughing, giving the victim "the finger" and referring to her as a "fucking bitch".

The final contact with the vehicle was as the three-quarter ton Ford van that Mr. Walker was operating went over top of the hood of the Corvette being operated by Ms. McWhorter.

Mr. Walker then drove north into Butler County, where his vehicle was found stopped along the side of the road as he was slumped over the steering wheel. Because there was substantial damage to Mr. Walker's van, police at first believed it to have been involved in a single vehicle accident, having not connected the incident in Hamilton County.

When police officers approached and brought Mr. Walker to consciousness, he became combative and resisted arrest. He later told the police officers that he was a "former Airborne Ranger", and would track down and kick the asses all of the police officers involved in his arrest. It was not a pretty picture.

## A MOTOR VEHICLE AS A DEADLY WEAPON

Ohio law is well settled that a motor vehicle is a deadly weapon as defined by R.C. §2923.11.

## PHYSICAL HARM OR ATTEMPTING TO CAUSE PHYSICAL HARM

Ms. McWhorter, graciously, only suffered a cut lip. However slight this might be, it certainly constitutes "physical harm" as defined by statute.

Ms. Dianna M. Anelli
Re: John Walker
May 14, 2001
Page 3

Further, even if there were no physical harm in this case, it is clear by statements attributed to Mr. Walker ("I'm going to kill you, bitch", etc.), as well as his repeated ramming actions, that he intended to cause physical harm to Ms. McWhorter.

So, this certainly constitutes the pivotal element of <u>felonious</u> assault.

**IT IS ALLEGED THAT I "NEVER PREPARED FOR TRIAL BECAUSE (I) NEVER INTENDED TO GO TO TRIAL IN SPITE OF EVIDENCE WHERE MR. WALKER COULD HAVE RECEIVED THE LESSER OFFENSE."**

The lesser offense of <u>negligent</u> assault in this case simply did not exist, except and unless due to the charity of the State. Unfortunately, charity was not warranted in the eyes of the State due to the aggravated nature of the facts, and due to the client's prior record. The record included several out of state DUI and leaving the scene convictions (similar as they may or may not be).

Mr. Walker's prior court appointed counsel had some idea that this matter should be tried despite what turned out to be terrible facts, because he believed that the lesser offense of <u>negligent</u> assault, only a misdemeanor of the third degree, would be the likely outcome upon trial by jury.

Frankly, I considered this to be preposterous. Further, had the case been tried under these circumstances and lost, then the bargain of three years would have been lost. Instead, it is clear by reputation and statement that Judge Crush would have "maxed" the client. This was made clear to the client, and he made a choice, later indicating <u>on the record</u> that his guilty plea as charged was knowing, intelligent and voluntary, and that he was satisfied with the advice and counsel provided by me, his attorney.

Indeed, I did prepare for trial and, in fact, investigated the case as much as possible in a short amount of time. I was at first delayed due to the fact that payment took so long to be received. Further, the prior attorney declined to give me the contents of Mr. Walker's file until an entry of substitution of counsel was placed of record.

In any event, separate discovery was obtained through prosecutor Andrew Berghausen, however limited it was at the time. The memo on Mr. Berghausen's fax of November 29, 1999 indicated "Here is the discovery we discussed. The photos and actual line-up will be available for inspection on 12-1. I will follow-up to

Ms. Dianna M. Anelli
Re: John Walker
May 14, 2001
Page 4

see if any laboratory reports on the paint exists. The registration records (of the client's van) will also be available on Wednesday." That Wednesday, of course, was to be the trial date. Certainly, I had hoped to obtain a continuance since all of the evidence was not yet available for inspection, and I had yet to speak with some of the witnesses.

I had already spoken with Jeanette Raichyk, who happened to be the sister of a political friend of mine. Jeanette had indicated the facts as set out earlier (except for the curses), and I knew she would be a good and credible witness against my client.

When trial day arrived, I spoke to Colerain Township Police Officer Denny Deaton about the paint chips taken from my client's vehicle and the McWhorter Corvette. He showed me the lab report, which had just been received by him. The report was clearly incriminating to the client. I also spoke to other witnesses who were unavailable. Still, because things were on the "fast track" (as I actually termed this to Mr. Walker), I wanted to get a continuance of the trial date in order to make sure that I wasn't missing something.

I remained puzzled by the idea that prior counsel was so convinced that this would be a _negligent_ assault, rather than a _felonious_ assault. I even asked Mr. Berghausen, "am I missing something?". Although I did not actually expect the prosecutor to set out any possible defense for me, we did have a discussion on the elements of the various offenses and how they compared to these facts. Certainly, the State was unwilling to reduce the charge, and a the three year sentence had already been negotiated by prior counsel (assuming the client did not go to trial).

When Mr. Berghausen and I finally were able to go into chambers to meet with Judge Crush, I indicated that I was still looking into the case and requested a continuance. Judge Crush, quite simply, blew his top.

Judge Crush stated that he should instead give Mr. Walker the maximum possible sentence, but had offered three years just to get rid of the case. He raised his voice and complained about "this guy changing lawyers at the last minute" and "trying to manipulate the system". Judge Crush was entirely angry, and made it very clear to me that the client would have to take his three years in a plea bargain on that date, or else get substantially more time in prison.

I went upstairs to the holding area, where I discussed this matter in great detail with Mr. Walker. I explained to him that the possibility of obtaining a verdict of negligent assault based upon the witness statements was "out of this world", and

Ms. Dianna M. Anelli
Re: John Walker
May 14, 2001
Page 5

that Judge Crush was going to take the three years "off the table" in the event that we did not plead immediately.

Although I thought this to be unfair on the part of Judge Crush, my hurried evaluation of the merits of the case was not at all favorable. I stand by that assessment today.

There is absolutely no question that Mr. Walker chose to plead out on that date and receive the earlier bargained three year sentence. Mr. Walker subsequently indicated his agreement with me, not only in our discussions in the holding area, but also <u>on the record</u> when Judge Crush accepted his plea.

### MR. WALKER FURTHER ALLEGES THAT I DID NOT RESOLVE THE MISDEMEANOR MATTERS IN BUTLER COUNTY AS I INDICATED I WOULD.

Although this was not part of the fee arrangement that I had with Mr. Walker, I did indicate to him that the holders he had from Butler County needed to be resolved. Ohio law provides that any time for which a person is sentenced for a misdemeanor runs concurrently with any time that he is presently doing for a felony in prison.

In order to have the holders removed, there is a procedure available under R.C.§ 2941.401, whereby a demand for trial is triggered through the warden's office. By demanding speedy trial in that manner, the State would theoretically have to transport the defendant for trial on the untried misdemeanors, in which case the misdemeanor time would run concurrently with the prison time remaining. However, it is often the practice that it makes no sense to transport an inmate under these circumstances. Instead, the cases are often dismissed.

As I stated, I did indicate to Mr. Walker that I would use this procedure to have his holders removed, so that he would not be facing additional time once his three years in prison were concluded. The process is easy. However, I received a telephone call from Mr. Walker on one occasion, presumably from C.R.C. Mr. Walker inquired concerning "judicial release", which I told him was out of the question with Judge Crush under these circumstances. This was the main purpose of his phone call, that I <u>believe</u> was a three-way call through his mother.

We also discussed the Butler County holders, and he indicated to me that "they" would do it for him at the institution without my involvement. I can't recall

Ms. Dianna M. Anelli
Re: John Walker
May 14, 2001
Page 6

specifically who "they" were, but it might have been the social workers or perhaps his case manager. In any event, Mr. Walker made it clear to me that my involvement with the DUI and resisting arrest charges that occurred in Hamilton on the tale end of his fiasco would be handled without my involvement.

### CONCLUSION

This counsel was retained very late in the case, apparently due to dis-satisfaction with prior, court appointed counsel. Mr. Walker, quite simply, had a bad case with no real defense. This counsel truly did save Mr. Walker from a longer sentence in the event that his case would have been tried and lost by prior counsel under a faulty theory.

Prior counsel was apparently bent on trying the case with the theory that the acts complained of were not "knowing" or "purposeful", but instead "negligent". I continue to assert that this theory was preposterous under the circumstances.

As for the holders in Butler County, they must have been cleared-up by September 8, 2002, about 15 ½ months from today's date. If they had not already been cleared-up, there would still be time for me to do so in any event.

Still, counsel asserts that he did receive a telephone call from the client during his incarceration, and that the client indicated that the holders would be taken care of as a matter of course without my further involvement. Upon checking, counsel finds that the holders have been removed, apparently due to the client's own actions. Regardless, the client did indicate that counsel need not take any further action as to the holders, but that the client or institutional personnel would see to them.

Please notify me of any further requirements you might have of me. Thank you for your fair consideration of this action despite my lack of timely response.

Sincerely,

Larry Keller
Attorney at Law

LK:Jmd
Enclosures: various documents
C:\My Documents\WALKER\Aneli ltr.514.wpd